Filed 8/10/26  Amaya v. Fig Leasing Co. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| ARTURO AMAYA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FIG LEASING CO., INC.,<br><br>    Defendant and Appellant. | B345424<br><br>Los Angeles County<br>Super. Ct. No. 23STCV22091 |

APPEAL from an order of the Superior Court of Los Angeles County, Samantha P. Jessner, Judge.  Affirmed.

THOMPSON COBURN, Michael S. Kun and Kevin D. Sullivan for Defendant and Appellant.

D.LAW, David Yeremian, David Keledjian and Svetlana Hovhannisyan for Plaintiff and Respondent.

Defendant FIG Leasing Co., Inc. (FIG) appeals from an order partially denying its motion to compel plaintiff Arturo B. Amaya to arbitrate certain employment claims. The trial court determined an arbitration agreement Amaya signed with a staffing agency, Howroyd-Wright Employment Agency, Inc., doing business as AppleOne, did not require arbitration of Amaya's claims arising after Amaya left AppleOne's employ and FIG hired him directly. We affirm.

## I.

AppleOne hired Amaya as an employee in December 2021 for potential placement with its clients. Amaya signed an Applicant Agreement. The Applicant Agreement included an arbitration provision. It provided: "AppleOne and I agree to arbitrate any disputes between us, including any claims that I may have against AppleOne's clients . . . including any claims or complaints that might otherwise be resolved in a court of law, and agree that all such disputes will only be resolved by an arbitrator through final and binding arbitration . . . ." "Disputes which AppleOne and I agree to arbitrate include, without limitation, . . . disputes against AppleOne's clients . . . regarding my job assignment(s) (or termination thereof), trade secrets, unfair competition, compensation, meal and rest periods, discrimination, harassment, retaliation, claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Fair Credit Reporting Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act, Genetic Information Non-Discrimination Act, all state statutes addressing the same or similar subject matters, and all other statutory and common law claims (excluding workers

compensation, state disability insurance and unemployment insurance claims)."  The arbitration provision also included a paragraph entitled "*Intended Third-Party Beneficiary*" that read: "AppleOne's clients . . . are intended third-party beneficiaries of this agreement . . . .  I understand and agree that my breach of this agreement may aggrieve, injure, and damage the Third-Party Beneficiaries.  It is expressly agreed to and understood by the parties that this Agreement confers rights and remedies upon the Third-Party Beneficiaries, including the right to enforce the terms of the Agreement."

Later that month, Amaya began working for FIG on a temporary assignment through AppleOne.  This assignment continued until August 29, 2022, when Amaya — having applied and been accepted to work for FIG as a direct hire — began employment directly with FIG.  Apparently, FIG and Amaya never entered into an arbitration agreement of their own.  Amaya's employment with FIG ended shortly after his hiring.

In September 2023, Amaya brought a putative class action complaint against both FIG and AppleOne, alleging various Labor Code violations.  Only months later, the trial court dismissed AppleOne without prejudice at Amaya's request.  Amaya subsequently filed a first amended class and representative action complaint in November 2023 and a second amended complaint in July 2024.  The latter, operative complaint included claims against FIG for failure to provide meal periods, failure to provide rest periods, failure to pay hourly wages and overtime at the correct rates, failure to provide accurate written wage statements, failure to timely pay all final wages, failure to indemnify, and unfair competition.

In January 2024, FIG filed a motion to compel Amaya to arbitrate his individual claims, to dismiss Amaya's proposed class claims, and to stay claims pending Amaya's individual arbitration. On February 3, 2025, the trial court issued an order granting in part and denying in part FIG's motion. The court granted FIG's motion to compel Amaya to arbitrate his claims based on conduct occurring before August 29, 2022 — the day Amaya commenced direct employment with FIG — and stayed court proceedings. The court denied the motion to compel as to all claims arising from conduct occurring on or after Amaya's hire date with FIG.

The court reasoned that after Amaya's temporary work assignment with FIG ended, his "subsequent work for [FIG] was outside the substantive scope of the Agreement between him and [AppleOne]. More specifically, his agreement with AppleOne to arbitrate 'disputes against AppleOne's clients . . . regarding my job assignment(s) (or termination thereof)' [did] not apply to his subsequent, post-assignment work for [FIG]; there [was] no evidence AppleOne was involved in this subsequent work relationship between the parties, as a provider of employment-placement services (to either party) or otherwise. Thus the Agreement, by its plain terms, [did] not encompass [Amaya's] claims that [FIG] violated the wage-and-hour laws while he worked for [FIG] directly, after his AppleOne assignment had ended — that is, after August 29, 2022, the first day he worked for [FIG] without AppleOne's involvement." FIG timely appealed.

## II.

FIG contends the arbitration provision in the Applicant Agreement with AppleOne required Amaya to arbitrate even those claims arising after Amaya left AppleOne's employ and

became FIG's direct employee.  The trial court did not err in concluding otherwise.

## A.

We review de novo a court's denial of a motion to compel arbitration when, as here, no material facts are in dispute. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (*US*)*, LLC* (2012) 55 Cal.4th 223, 236.)

Both the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.) and the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) acknowledge arbitration as " ' " 'a speedy and relatively inexpensive means of dispute resolution' " ' " allowing those " ' " 'who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' " ' "  (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59.)  The "fundamental policy underlying both acts 'is to ensure that arbitration agreements will be enforced *in accordance with their terms.*' "  (*Ibid.*)

When "a party to an arbitration agreement alleg[es] the existence of a written agreement to arbitrate a controversy," the party may move for an order to arbitrate based on the agreement.  (Code Civ. Proc., § 1281.2.)  The moving party bears the burden of proving such an agreement exists, including producing prima facie evidence of the agreement.  (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413.)  If the opposing party contests the validity or enforceability of the agreement, the burden then shifts to the opposing party to produce evidence in support of such defense.  (*Ibid.*)

The court's role on a motion to compel arbitration is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at

issue." (*Chiron Corp. v. Ortho Diagnostic Systems, Inc.* (9th Cir. 2000) 207 F.3d 1126, 1130.) "In determining the scope of an arbitration clause, '[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made.' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.) "Without a clear agreement to arbitrate a controversy, courts will not infer that the right to a jury trial has been waived." (*Garcia v. Expert Staffing West* (2021) 73 Cal.App.5th 408, 413.)

**B.**

FIG asserts, as a client of AppleOne and undisputed third-party beneficiary of the arbitration agreement Amaya signed with AppleOne, it may enforce the agreement. To FIG, the "plain language" of the agreement creates no temporal limitation and does not exclude any of Amaya's Labor Code or unfair competition claims.

Amaya agrees that FIG was an AppleOne client and a third-party beneficiary to AppleOne's arbitration agreement with Amaya during the time AppleOne loaned Amaya to FIG on a short-term employment assignment. But Amaya disagrees that the agreement had no temporal limitation, instead arguing FIG "ceased to be a client of AppleOne" with regard to Amaya's employment once FIG employed Amaya directly.

On this disputed issue, Amaya has the better view.

The recent opinion in *Toothman v. Redwood Toxicology Laboratory, Inc.* (2026) 120 Cal.App.5th 412 (*Toothman*), is instructive. There, an employment agency, Apex, hired Toothman as an employee and placed him temporarily with one of its clients, Redwood. (*Id.* at p. 416.) Under an employment

6

agreement between Toothman and Apex, it was explained that Apex is " 'engaged in the business of hiring contract employees to perform services on a temporary basis to third party businesses,' . . . define[d] as 'Clients.' " (*Id.* at p. 420.) Toothman and Apex further agreed " 'to arbitrate any dispute arising out of or related to [Toothman's] employment with, or termination of employment from, Company.' " (*Id.* at p. 416.) And the arbitration agreement noted it did not alter the "at–will" status of Toothman's employment. (*Id.* at p. 424.) Toothman's employment with Apex ended in April 2018 when Toothman began working directly for Redwood, where he stayed for four years. Toothman and Redwood did not enter into an arbitration agreement. (*Ibid*.)

After leaving Redwood, Toothman filed a class action against Redwood alleging Labor Code violations. Toothman limited his claims to those based on Redwood's conduct from September 2018 onward, after he had stopped working for Apex and started working directly for Redwood. Redwood filed a motion to compel arbitration, arguing it was a party to Toothman's agreement with Apex and Toothman's claims fell within the scope of the agreement. (*Toothman, supra*, 120 Cal.App.5th at pp. 416–417.) The trial court denied Redwood's motion and the Court of Appeal affirmed, holding Toothman's claims were outside the scope of the arbitration agreement between Toothman and Apex. (*Id.* at pp. 417, 425.)

Although the Court of Appeal concluded the arbitration agreement there applied, by its terms, to "affiliates" and not "clients" such as Redwood, the court nonetheless assumed for purposes of argument that Redwood could invoke the arbitration agreement as a third-party beneficiary. (*Toothman*, *supra*, 120 Cal.App.5th at p. 425.) Even assuming so, Redwood could

7

not invoke the agreement in Toothman's case. The agreement's scope, held the court, was limited to those claims occurring while Toothman was employed by Apex or claims related to his termination by Apex. The agreement did not, the court held, include claims " 'aris[ing] out of or relat[ed] to' " Toothman's "direct employment with Redwood, after he had left Apex." (*Id.* at pp. 425, 427.) The court determined Toothman "did not agree to arbitrate [such] claims with any party, because they are outside the Arbitration Agreement's substantive scope." (*Id.* at p. 425.) As the court observed, "[b]ecause a person hired directly by a Client is not employed pursuant to the Employment Agreement, and the Arbitration Agreement would not serve its stated purpose in that context, it is unreasonable to interpret the Arbitration Agreement as applying to such a person." (*Id.* at p. 423.) Nor would it be "sensible to posit that Apex arrogated to itself the right to prescribe the dispute resolution procedure that governs employment disputes between one of its Clients and that Client's own employees." (*Id.* at p. 424, italics omitted.)

The fact pattern before us is, in relevant respects, similar to that in *Toothman*. In both cases, an employee was employed by an employment agency, was loaned out to another business, was later hired directly by that business, and subsequently sued the business for wage-and-hour violations that occurred during the period of his direct employment with the business. Further, several features of the Applicant Agreement are similar to those of the agreement in *Toothman* and support following its approach. Like in *Toothman*, while AppleOne employees are on temporary assignment with AppleOne's clients, they remain at-will employees of AppleOne, not employees of its clients. Assignments with clients are short-term and determined by the

staffing agency, AppleOne. Employee wages, compensation, and benefits all come through the staffing agency, AppleOne; employees receive no wages, compensation, or benefits directly from AppleOne's clients. On the other hand, no language in the Applicant Agreement suggests AppleOne's clients act as "clients" outside of receiving temporary workers on assignment. Indeed, the agreement consistently refers to AppleOne's employees' "assignments" with AppleOne's clients, reinforcing the understanding that such short-term assignments are the principal purpose of the relationship between AppleOne and its clients. AppleOne's clients and AppleOne's employees are in direct relationship with AppleOne, and their relationships to each other proceed through AppleOne. If an AppleOne employee becomes a client's employee, AppleOne's intermediary role concludes.

We also agree with *Toothman* that, generally speaking, it would not be "sensible to posit" that a staffing agency would be expected to "arrogate[] to itself the right to prescribe the dispute resolution procedure that governs employment disputes between one of its Clients and that Client's own employees." (*Toothman*, *supra*, 120 Cal.App.5th at p. 424, italics omitted.) When a business directly hires an employee, they will work out their own contractual relationship upon hiring, and it seems unhelpful and haphazard to both the employer and employee to have new employees treated differently from one another depending not only on whether they first performed work through a staffing agency, but also on which staffing agency. (*Ibid.*) If FIG, for instance, wanted arbitration of disputes with its employees, Amaya included, it could have easily sought such an agreement. Amaya, meanwhile, would have reasonably expected his direct

9

employment relationship with FIG to be governed by agreements with it, not his previous employer.

In sum, the arbitration agreement here does not encompass claims made by Amaya, as a former AppleOne employee, against his direct employer when this new employment relationship, as the trial court put it, "in no way involved AppleOne." From December 2021 until August 2022, Amaya was employed by AppleOne and loaned out on temporary assignment to FIG. During that period, the relationship between AppleOne and FIG as pertained to Amaya was the "client" relationship described in the arbitration agreement. But starting on August 29, 2022, Amaya's employment with AppleOne ended and his direct employment with FIG began. Subsequently, AppleOne had no involvement in the relationship between FIG and Amaya, nor did it have a client relationship with FIG as pertained to Amaya. Amaya's claims arising from FIG's conduct on or after August 29, 2022, are not encompassed by the agreement.

Our conclusion here is buttressed by *Manzano v. Pom Medical, LLC* (C.D.Cal. Dec. 4, 2025, No. 2:25-cv-00993-ODW (SSCx) 2025 U.S.Dist. LEXIS 251600 (*Manzano*))*,* a federal district court decision Amaya cites. " 'Although not binding, unpublished federal district court cases are citable as persuasive authority.' " (*Gray v. Quicken Loans, Inc.* (2021) 61 Cal.App.5th 524, 528, fn. 2; see also *McCann v. Lucky Money, Inc.* (2005) 129 Cal.App.4th 1382, 1396 [lower federal court opinions are citable on state law matters "for their cogent reasoning and persuasive value"].)

Manzano entered an employment agreement with a staffing agency, Kelly, and agreed "to arbitrate covered claims that arise between Manzano and Kelly, its affiliated companies,

10

and its clients or customers." (*Manzano, supra*, 2025 U.S.Dist. Lexis 251600 at p. *2.) Kelly placed Manzano on a temporary assignment with Pom Medical, LLC and Stryker Employment Company, LLC (Stryker), one of Kelly's clients. The temporary assignment ended on September 17, 2023. On September 18, 2023, Stryker hired Manzano "to work for it directly, performing the same work and at the same location where she had previously worked through Kelly." Stryker "did not present Manzano with any arbitration agreement related to her direct employment." (*Ibid.*)

Manzano remained an employee of Stryker until February 2024, after which she filed a representative action against Stryker, making wage-and-hour claims deriving from Stryker's conduct during the time period when she worked for Stryker directly. Stryker moved to compel Manzano to arbitrate her claims based on the agreement she had signed with Kelly. (*Manzano, supra*, 2025 U.S.Dist. Lexis 251600 at p. *3.)

The district court denied Stryker's motion to compel arbitration, finding Manzano's claims against Stryker were outside of the scope of Manzano's arbitration agreement with Kelly. (*Manzano, supra*, 2025 U.S.Dist. Lexis 251600 at pp. *6–7.) As the court explained, "[t]he Kelly Agreement requires arbitration for covered claims that arise between Manzano and Kelly, its affiliates, and its 'clients or customers.' [Citation.] From May 22, 2023, to September 17, 2023, Stryker acted as Kelly's 'client' when it employed Manzano through Kelly's placement service. However, Manzano's temporary employment ended on September 17, 2023, and on September 18, 2023, Stryker hired Manzano directly and ceased acting as Kelly's client for purposes of Manzano's employment. Thus, as of the

11

date Stryker hired Manzano directly, it ended its entitlement to any express or intended benefit in the Kelly Agreement." (*Id.* at p. *6.) The court continued: "Manzano asserts claims against Stryker that arise distinctly from her direct employment with Stryker . . . . [T]he wage-and-hour claims against Stryker here arise from Manzano's direct employment with Stryker, to which the Kelly Agreement does not apply." (*Id.* at pp. *6–7.)

Here, like in *Manzano*, FIG was a client of AppleOne for the purpose of Amaya's employment with AppleOne when AppleOne placed Amaya with FIG on a temporary work assignment. When that employment ended, AppleOne was no longer Amaya's employer, and FIG was no longer obtaining services from Amaya as an AppleOne employee.

FIG argues the trial court erred in denying its motion to compel arbitration of all of Amaya's claims because "any doubts concerning the scope of the arbitrable issues are resolved in favor of arbitration." But the policy in favor of arbitration " 'is merely an acknowledgment of the FAA's commitment to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." ' " (*Goldman, Sachs & Co. v. City of Reno* (9th Cir. 2014) 747 F.3d 733, 742; accord, *Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 579, citing *Morgan v. Sundance, Inc.* (2022) 596 U.S. 411, 418.) "Accordingly, it is both federal policy and California policy to treat arbitration agreements like other agreements." (*Toothman, supra,* 120 Cal.App.5th at p. 417.) Just this year, our Supreme Court reiterated that "reliance on the policy favoring arbitration as an interpretive presumption [is] misplaced." (*Fuentes v. Empire Nissan, Inc.* (2026) 19 Cal.5th 93, 110.)

FIG sees ambiguity arising from a perceived conflict between the language of section 7, subdivision (B) of the agreement, which states "[d]isputes which AppleOne and I agree to arbitrate include, without limitation . . . disputes against AppleOne's clients and subcontractors *regarding my job assignment(s)* (*or termination thereof*)" and the language of section 7, subdivision (A), which states "AppleOne and I agree to arbitrate any disputes between us, including *any claims* that I may have against AppleOne's clients." (Italics added.) There is no relevant ambiguity. First, *both* clauses expansively describe the types of claims subject to arbitration. One states "any claims"; the other gives a list of examples "without limitation." Second, any discrepancy is not pertinent to whether the agreement extends to claims that accrue after the AppleOne employment concluded. As both subdivisions FIG cites as ambiguous restrict the agreement's applicability to AppleOne's "clients," they raise no relevant conflict.

Finally, FIG argues the trial court "erred in only compelling Amaya's claims arising out [of] his placement with FIG through his employment with AppleOne, because his claims are identical throughout the entire period of time at issue." In support, FIG cites two cases: *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401 and *Franco v. Greystone Ridge Condominium* (2019) 39 Cal.App.5th 221. Collectively, these cases stand for the proposition that claims based on conduct occurring before the execution of an arbitration agreement or after termination of employment can be "rooted" in the employment relationship created by contract and therefore governed by an arbitration agreement in that contract. (*Buckhorn*, at p. 1407; *Franco*, at p. 230.) However, unlike in

13

*Buckhorn* and *Franco*, Amaya's claims against FIG for conduct occurring on or after August 29, 2022, are not "rooted" in Amaya's employment relationship with AppleOne at all, as AppleOne had no involvement in the relationship between FIG and Amaya from that date onwards.  (Cf. *Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 222 ["Defendant cites no authority that factual commonalities are sufficient to justify extension of an arbitration agreement to precontractual employment claims absent any indication the parties understood the agreement would apply in that manner"]; see also *Vazquez v. SaniSure, Inc.* (2024) 101 Cal.App.5th 139, 142.)

## DISPOSITION

We affirm the order denying in part FIG's motion to compel arbitration and award Amaya his costs on appeal.


SCHERB, J.


We concur:


STRATTON, P. J.



VIRAMONTES, J.


14